1  SPERTUS, LANDES & UMHOFER, LLP
   James W. Spertus (SBN 159825)
2  Ezra D. Landes (SBN 253052)
   1990 South Bundy Dr., Suite 705
3  Los Angeles, California 90025
   Telephone: (310) 826-4700
4  Facsimile:  (310) 826-4711
   jim@spertuslaw.com
5  ezra@spertuslaw.com

6  Attorneys for Plaintiffs Finsa Portafolios, S.A. de C.V. and
   FINSA CKD M Fideicomiso CIB/2017
7

8                UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11 FINSA PORTAFOLIOS, S.A. DE          Case No.
   C.V., a Mexican corporation; FINSA
12 CKD M FIDEICOMISO CIB/2017, a      **COMPLAINT FOR:**
   Mexican trust,
13                                     (1) **FRAUDULENT**
                 Plaintiffs,               **REPRESENTATIONS;**
14                                     (2) **FRAUDULENT**
             v.                            **CONCEALMENT;**
15                                     (3) **PROMISSORY FRAUD;**
   OPENGATE CAPITAL, LLC, a           (4) **CONSTRUCTIVE FRAUD;**
16 California limited liability company; (5) **BREACH OF CONTRACT**
   OPEN PUBLISHING, LLC, a               **(LEASE AGREEMENT);**
17 Delaware limited liability company; (6) **BREACH OF CONTRACT**
   ROUNDROCK 092012, LLC, a              **(GUARANTY OF LEASE);**
18 Delaware limited liability company;
   ROUNDROCK SCIENTIFIC            **DEMAND FOR A JURY TRIAL**
19 INTERNATIONAL, LLC, a Delaware
   limited liability company;
20 ROUNDROCK MEXICO, LLC, a
   Delaware limited liability company;
21 HAMILTON SCIENTIFIC, LLC, a
   Delaware limited liability company;
22 HAMILTON LABORATORY
   SOLUTIONS, LLC, a Delaware
23 limited liability company,

24                Defendants.

25

26

27

28

*COMPLAINT*

1   Come now Plaintiffs Finsa Portafolios, S.A. de C.V. and FINSA CKD M

2   Fideicomiso CIB/2017 (collectively, "FINSA"), and complain, aver and allege as

3   follows:

## I.   INTRODUCTION

5   1.   Defendant OpenGate Capital, LLC is a private equity firm based in

6   Los Angeles, California, with a long-documented history of illegal, unethical and

7   unscrupulous business practices.  FINSA, a purchaser of Mexican industrial real-

8   estate, is OpenGate's latest victim.  In 2012, OpenGate purchased from Thermo

9   Fisher Scientific, Inc. a laboratory furniture manufacturing business that became

10  Hamilton Scientific, LLC, and the purchase included Thermo Fisher's

11  manufacturing facility located in Reynosa, Mexico (the "Reynosa Facility").

12  Immediately after purchasing the Reynosa Facility, OpenGate discovered that

13  Thermo Fisher had failed to disclose that the Reynosa Facility was overrun by

14  the infamous drug kingpin and then-fugitive "El Chapo" Guzman's drug cartel,

15  which threatened the viability of Hamilton Scientific, LLC and diminished the

16  value of the Reynosa Facility.  On a daily basis, at all hours of the day, the

17  Reynosa Facility was infiltrated by senior local leaders of the drug cartel.  On an

18  ongoing basis, El Chapo's armed "soldiers" terrorized the employees at the

19  Reynosa Facility, and treated the Reynosa Facility as their own private refuge

20  from rival cartels and law enforcement.  El Chapo himself maintained a personal

21  residence behind the Reynosa Facility.  Use of the Reynosa Facility by El

22  Chapo's drug cartel made the facility far less valuable then it would otherwise

23  be, and was unsafe for the Hamilton Scientific, LLC manufacturing business.

24  2.   In May 2013, OpenGate filed a federal civil action against Thermo

25  Fisher in the United States arising from Thermo Fisher's failure to disclose the

26  impact of drug cartel activities on the Hamilton Scientific, LLC business and the

27  Reynosa Facility that Thermo Fisher had sold to OpenGate.  Then, while

28  OpenGate's lawsuit against Thermo Fisher was pending, OpenGate turned

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

2.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1   around and sold the Reynosa Facility to FINSA in December 2014, without
2   disclosing to FINSA the material non-disclosures it was then litigating against
3   Thermo Fisher for failing to disclose.  In fact, OpenGate affirmatively
4   represented to FINSA that it was unaware of litigation involving the Reynosa
5   Facility when, in fact, OpenGate was the plaintiff in litigation involving the
6   Reynosa Facility.  OpenGate perpetuated the same fraud on FINSA that it was in
7   the midst of prosecuting against Thermo Fisher.

8       3.      As a condition of the sale of the Reynosa Facility to FINSA,
9   OpenGate separately agreed to lease back the Reynosa Facility from FINSA for a
10  ten-year term, with monthly rental payments of $120,881.15, increased yearly.
11  OpenGate pledged Hamilton Scientific as the guarantor of the lease, and
12  provided FINSA with growth projections for Hamilton Scientific through 2016
13  that fraudulently concealed that Hamilton Scientific was on the verge of failure.
14  In reliance on OpenGate's representations, FINSA then wired to OpenGate more
15  than $15 million for the purchase of the Reynosa Facility.  Then, as soon as
16  OpenGate's first full rental payment to FINSA became due, less than one month
17  after entering into the ten-year lease, OpenGate failed to pay rent and
18  immediately shut down the guarantor, Hamilton Scientific.  OpenGate then sold
19  Hamilton Scientific, which incorporated itself into a new entity to escape
20  creditors called Hamilton Laboratory Solutions, LLC, which continues today to
21  operate the exact same business previously run by Hamilton Scientific.

22      4.      OpenGate engaged in duplicitous behavior to accomplish a
23  remarkable fraud by making false representations and concealing material facts
24  during the due diligence period and within the transactional documents
25  underlying the sale-lease back transaction.  OpenGate and its alter ego entities
26  also breached the underlying lease agreement and guaranty of lease.  With this
27  action, FINSA seeks to recover compensatory damages for the fraud and breach
28  of contract, plus punitive damages.

3.

## II.   **THE PARTIES**

5.     Plaintiff Finsa Portafolios, S.A. de C.V. is a Mexican corporation with its principal place of business located in México.

6.     Plaintiff FINSA CKD M Fideicomiso CIB/2017 is a Mexican trust with its principal residence in México.  (Plaintiffs Finsa Portafolios, S.A. de C.V. and FINSA CKD M Fideicomiso CIB/2017 are collectively referred to herein as "FINSA.").

7.     Defendant OpenGate Capital, LLC is, and at all times material herein was, a California limited liability company with its principal place of business located in Los Angeles, California.  OpenGate Capital, LLC is the parent company of defendant Open Publishing, LLC.

8.     Defendant Open Publishing, LLC is, and at all times material herein was, a Delaware limited liability company with its principal place of business located in Los Angeles, California.  Open Publishing, LLC is a subsidiary of OpenGate Capital LLC, and it serves as a holding company for defendant RoundRock 092012 LLC.  (OpenGate Capital, LLC and Open Publishing, LLC are collectively referred to herein as the "OpenGate Entities.").

9.     Defendant RoundRock 092012, LLC is, and at all times material herein was, a Delaware limited liability company with its principal place of business located in Los Angeles, California.  RoundRock 092012 LLC is a subsidiary of Open Publishing, LLC, and it serves as a holding company for defendants RoundRock Scientific International LLC and RoundRock Mexico LLC.

10.     Defendant RoundRock Scientific International, LLC is, and at all times material herein was, a Delaware limited liability company with its principal place of business located in Los Angeles, California.  RoundRock Scientific International, LLC is a subsidiary of RoundRock 092012 LLC, and it serves as

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

4.

an acquisition vehicle for defendant Hamilton Scientific LLC and for Fisher Hamilton, S. de R.L. de C.V.

11. Defendant RoundRock Mexico, LLC is, and at all times material herein was, a Delaware limited liability company with its principal place of business located in Los Angeles, California. RoundRock Mexico LLC is a subsidiary of RoundRock 092012 LLC, and it serves as an acquisition vehicle for Fisher Hamilton, S. de R.L. de C.V. (RoundRock 092012, LLC, RoundRock Scientific International, LLC and RoundRock Mexico, LLC are collectively referred to herein as the "RoundRock Entities." The OpenGate Entities and the RoundRock Entities are collectively referred to herein as "OpenGate.").

12. Defendant Hamilton Scientific, LLC is currently a defunct limited liability company that, at all times material herein was, a Delaware limited liability company with its principal place of business located in Los Angeles, California. Hamilton Scientific, LLC is a subsidiary and operating entity of the acquisition vehicle RoundRock Scientific International LLC.

13. Defendant Hamilton Laboratory Solutions, LLC is, and at all times material herein was, a Delaware limited liability company with its principal place of business located in Manitowoc, Wisconsin.

### III. JURISDICTION AND VENUE

14. Subject matter jurisdiction over this action is founded upon 28 U.S.C. § 1332. Complete diversity exists between Plaintiffs and Defendants. Plaintiffs are a Mexican corporation and trust. Defendant OpenGate Capital, LLC is a citizen of California, where it is incorporated and where it maintains its principal place of business. Hamilton Laboratory Solutions, LLC is a citizen of Delaware, where it is incorporated, and a citizen of Wisconsin, where it has its principal place of business. The remaining defendants are citizens of Delaware, where they are incorporated, and California, where their principal places of

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1   business are located.  The matter in controversy exceeds the sum or value of

2   $75,000.

3        15.    With respect to each defendant, except Hamilton Laboratory

4   Solutions, LLC, this Court has personal jurisdiction over each of them because

5   their principal places of business are located in California, and they are therefore

6   domiciled in and citizens of California.  With respect to Hamilton Laboratory

7   Solutions, LLC, this Court has personal jurisdiction because, as alleged infra in

8   paragraph 89, which is incorporated herein by this reference, Hamilton

9   Laboratory Solutions, LLC is the successor of Hamilton Scientific, LLC, a

10  citizen of California, and Hamilton Scientific, LLC's contacts with California are

11  therefore imputed to Hamilton Laboratory Solutions, LLC.

12       16.    Venue is proper under 28 U.S.C. § 1391 because defendants are

13  subject to the Court's jurisdiction in this judicial district, and separately because

14  a substantial part of the events or omissions giving rise to the claims occurred in

15  this judicial district.

16                    **IV.    GENERAL ALLEGATIONS**

17  **A.    OpenGate Purchases The Hamilton Entities From Thermo Fisher.**

18       17.    Thermo Fisher Scientific Inc. ("Thermo Fisher") is a publicly-traded

19  biotechnology product development company that, according to its website, "is

20  the world leader in serving science, with revenues of $17 billion and more than

21  50,000 employees in 50 countries."

22       18.    As of June 2012, Thermo Fisher carried on its books a business it

23  referred to as the Laboratory Workstations Business ("Lab Workstations"),

24  which was owned by a group of Thermo Fisher-owned entities including Fisher

25  Hamilton S. de R.L. de C.V.  (These entities and Lab Workstations are

26  collectively referred to herein as the "Hamilton Entities").

27       19.    As of June 2012, Lab Workstations was one of the leading

28  designers, manufacturers and installers of laboratory furniture, fume hoods and

6.

*COMPLAINT*

epoxy resin tops that were sold under the Hamilton brand name to a customer base that included universities, hospitals and research institutes.  Lab Workstations manufactured its products at facilities located in Texas, Arkansas, Wisconsin, and Reynosa, Mexico.  The facility in Reynosa, Mexico (the "Reynosa Facility") is approximately 370,000 square feet and, as of June 2012, Lab Workstations employed at the Reynosa Facility a workforce of approximately 1,000 employees.  As of June 2012, the Reynosa Facility generated approximately 40-50% of Lab Workstation's revenue.

20.     On June 4, 2012, Thermo Fisher retained Barclays Capital to assist it with a sale of the Hamilton Entities, including Lab Workstations and the Reynosa Facility.  On or about June 28, 2012, Thermo Fisher announced in a Current Report on Form 8-K filed with the Securities and Exchange Commission that "in an effort to exit a non-core business," Thermo Fisher's "senior management made a decision to pursue a sale of its laboratory workstations business, part of its Laboratory Products and Services Segment."

21.     On July 2, 2012, OpenGate contacted Barclays and expressed interest in purchasing the Hamilton Entities.

22.     On July 11, 2012, OpenGate sent Thermo Fisher a letter of intent expressing interest in acquiring the Hamilton Entities.  In July and August 2012, Thermo Fisher hosted site visits and diligence meetings at the Hamilton Entities' Reynosa Facility, and at the Hamilton Entities' facilities in Texas, Arkansas and Wisconsin.  OpenGate employee Jack Roberts attended each of these site visits and diligence meetings on behalf of OpenGate.

23.     On September 22-23, 2012, Jack Roberts and other OpenGate representatives met for negotiations with Thermo Fisher's representatives at the Boston office of Thermo Fisher's attorneys, Pepper Hamilton, LLP.

24.     In October 2012, Thermo Fisher and OpenGate entered into an Equity Purchase and Sale Agreement for the purchase of the Hamilton Entities.

7.

*COMPLAINT*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  Consideration included $3 million in cash, 10% of the fully diluted equity of
2  RoundRock 092012 at closing, a promissory note for $10 million, as well as
3  assumed liabilities.  At midnight on October 22, 2012, OpenGate took possession
4  of the premises of each of the Hamilton Entities' facilities in the United States
5  and Mexico.  Following the sale, Lab Workstations was renamed Hamilton
6  Scientific, LLC, and is also known as Hamilton Scientific.

7  **B.**      **OpenGate Sues Thermo Fisher For Failing To Disclose That The**
8  **Reynosa Facility Was "Overrun" By El Chapo's Drug Cartel.**

9           25.     On May 10, 2013, OpenGate filed an action in the United States
10  District Court for the Central District of California against Thermo Fisher
11  alleging claims for: (1) violation of section 10(b) and Rule 10b-5 of the
12  Securities Exchange Act of 1934; (2) fraudulent misrepresentation; (3) negligent
13  misrepresentation; (4) breach of contract; (5) violation of section 9(A)(4) of the
14  Securities Exchange Act of 1934; and (6) Breach of the Implied Covenant of
15  Good Faith and Fair Dealing (the "Thermo Fisher Action").  The Thermo Fisher
16  action was ultimately transferred from the Central District of California to the
17  District of Delaware, and on August 7, 2014, OpenGate filed a Second Amended
18  Complaint ("SAC") in the Thermo Fisher Action.

19           26.     In the Thermo Fisher Action, OpenGate alleged in its SAC that
20  "Thermo Fisher acted in bad faith, and engaged in painstaking duplicitous
21  behavior, in an effort to induce Plaintiffs to purchase its Lab Workstations
22  Business in October 2012 . . . by, among other things, fraudulently concealing
23  and misrepresenting critical information related to the safety, security, viability
24  and operation of the business, including that its primary manufacturing facility
25  had been overrun by the Mexican Gulf Cartel, an intimidating and violent
26  criminal syndicate and drug trafficking organization residing in Mexico (the
27  'Cartel'), for more than two years prior to the Sale."

28

*COMPLAINT*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

27.     OpenGate further alleged that "[o]n October 23, 2012, within hours of RoundRock assuming possession and ownership of the facilities, an employee at the Reynosa Facility told an OpenGate representative," specifically Jack Roberts, "about the Cartel's regular entry of the premises, including that it had impaired and/or eliminated the function of its guard booth, and encroached into the main building itself, at the Reynosa Facility."  OpenGate alleged that "[t]he employee told Mr. Roberts that this situation was raised to the prior owner (Thermo Fisher), but that they failed to take corrective action.  The employee also expressed serious concerns about the Facility going forward, and pleaded with the new owner to ensure that it would take the action that Thermo Fisher had failed to take."

28.     OpenGate alleged in the Thermo Fisher Action that after receiving this information, it "immediately initiated an investigation to determine the nature and extent of the Gulf Cartel activity at the Reynosa Facility."  OpenGate alleged that as a result of its investigation it discovered that "[t]he Reynosa Facility is, and has been continuously since at least 2011 (while Thermo Fisher still owned the Hamilton Entities), infiltrated by senior local leaders of the 'Gulf Cartel,' . . . on a daily basis and at all hours of the day."  OpenGate also discovered that members of the drug cartel had "brandished weapons to employees at the Reynosa Facility in order to gain access to the parking lot."  OpenGate also alleged in the Thermo Fisher action that the "fugitive" El Chapo Guzman, "a 'senior member' of the Gulf Cartel" and "Mexico's 'top drug kingpin lord,' someone whose reach surpasses that of Pablo Escobar . . . had a residence behind the [Reynosa Facility] and would use Thermo Fisher's parking lot as his own and his other cartel members' purposes," including having "cartel members take refuge within the parking lot if they were being chased by the police or army."

*COMPLAINT*

29.    OpenGate alleged that "[o]n or about September 23, 2012 – in the midst of negotiations between [OpenGate] and Thermo Fisher, no less – armed militants entered the cafeteria at the Reynosa Facility after being followed by rivals (either opposing cartel members or soldiers)" and took refuge in the cafeteria.

30.    OpenGate alleged that it also discovered through its investigation that "Thermo Fisher's security advisors attempted to develop a strategy for security measures to be taken at the Reynosa Facility in response to the cartel infiltration," but "[n]one of the proposed measures or upgrades were meaningfully or effectively implemented, despite repeated requests from employees at the Reynosa Facility."  OpenGate alleged that "as a result of the Cartel activity, the managers of the Reynosa Facility leave the premises each day before sundown."

31.    OpenGate alleged that "[a]s of the time RoundRock took possession of the Reynosa Facility, the presence of the Cartel was widespread and pervasive" and that "[m]embers of the cartel, known as 'hawks,' occupy a daily presence outside of the gate of the Facility . . . 24 hours a day, 7 days a week, even taking comfort in the air-conditioned security booth when it is helpful."

32.    OpenGate alleged that "[e]xecutives at the highest level of . . . Thermo Fisher leadership were aware and had received correspondence almost contemporaneously with their occurrence of all of these activities."  OpenGate alleged that "Thermo Fisher understood that the security threats, and breaches of the Reynosa Facility by members of a drug cartel, would influence the course of negotiations and would likely dissuade RoundRock from entering into the Purchase Agreement."  OpenGate alleged that during the course of their negotiations, Thermo Fisher actively concealed from OpenGate and failed to disclose the Gulf Cartel activities at the Reynosa Facility.  OpenGate also alleged

10.

*COMPLAINT*

that Thermo Fisher made false representations and warranties in the written agreements underlying the sale of the Hamilton Entities.

33.     In a pre-trial pleading filed in the Thermo Fisher Action on March 7, 2016, OpenGate alleged that "[a]s a result of the ongoing cartel activity, the Hamilton Entities have suffered damages in the form of, at least, the loss of sales, existing customers and dealers, and potential business opportunities.  Plaintiffs also had difficulty obtaining funding due to cartel activity.  This has led to the eventual winding down of Hamilton Scientific in the spring of 2015."

34.     In the Thermo Fisher Action, a trial was scheduled to begin on May 2, 2016, but on April 6, 2016, a stipulation of dismissal with prejudice was filed by OpenGate, and the action was dismissed the following day.

**C.**     **During The Pendency Of The Thermo Fisher Action, OpenGate Sells The Reynosa Facility To FINSA And Does Not Disclose The Thermo Fisher Action To FINSA And Makes Other Material Misrepresentations.**

35.     Prior to Thermo Fisher's sale of the Hamilton Entities to OpenGate, FINSA's Director of Sales for Northern Mexico, Hector Romeu, had communicated on occasion with the Plant Manager for the Reynosa Facility, Richard Cano, and Mr. Cano was aware that FINSA had an interest in acquiring industrial Mexican real-estate assets and entering into sale-lease back agreements with the owners.

36.     On March 24, 2014, Mr. Cano first informed FINSA that the owner of Hamilton Scientific, OpenGate, wanted to explore the possibility of a sale-lease back agreement for the Reynosa Facility under which FINSA would purchase the Reynosa Facility only, but not Hamilton Scientific, the occupant, and then lease the building back to Hamilton Scientific, which would continue to use the facility for its manufacturing.  That same day, Mr. Romeu met with Mr. Cano at the Reynosa Facility for a brief meeting to discuss the potential deal.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

11.

37.    Following the meeting, Mr. Cano requested that FINSA prepare a sale-lease back proposal, and also said that he would provide FINSA with financial statements for Hamilton Scientific for the last three years to provide FINSA with assurance that Hamilton Scientific, the occupant that intended to lease the Reynosa Facility and the eventual guarantor of the lease, was a financially viable entity.

38.    On April 8, 2014, OpenGate's employee Virginia Thornton provided FINSA with Hamilton Scientific's financials, copying on the email OpenGate employee and Hamilton Scientific's President and CEO, Jack Roberts. Jack Roberts had previously represented OpenGate in connection with its purchase of the Hamilton Entities from Thermo Fisher, after which OpenGate placed Jack Roberts in charge of running Hamilton Scientific on behalf of OpenGate.  In Virginia Thornton's April 8, 2014 email, she informed FINSA that Fisher Hamilton S. de R.L. de C.V., which was a subsidiary of two subsidiaries (defendants RoundRock Scientific, LLC and RoundRock Mexico, LLC) of a subsidiary (defendant RoundRock 092012 LLC) of a subsidiary (defendant Open Publishing, LLC) of OpenGate's ultimate parent company (OpenGate Capital LLC) was the entity that officially held the Reynosa Facility and would be the party to the transaction, and that RoundRock 092012 LLC would potentially be the guarantor.

39.    On June 6, 2014, Virginia Thornton, on behalf of OpenGate, informed FINSA that OpenGate was ready to move forward on a formal Letter of Intent ("LOI").

40.    On July 7, 2014, Virginia Thornton, on behalf of OpenGate, provided FINSA with detailed financial forecasts for Hamilton Scientific, projecting significant growth for Hamilton Scientific's and the Reynosa Facility's revenues through 2016.  On July 29, 2014, Jack Roberts, on behalf of OpenGate, also provided FINSA with details regarding Hamilton Scientific's and

12.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

the Reynosa Facility's growth strategies going forward.  Throughout the negotiations between OpenGate and FINSA, Jack Roberts corresponded with FINSA using both his Hamilton Scientific and OpenGate email addresses.

41.     Beginning on or about August 13, 2014, FINSA and OpenGate began negotiating the LOI.  OpenGate engaged counsel in Mexico from DLA Piper to negotiate the LOI on their behalf.  On August 27, 2014, after several weeks of negotiations, OpenGate's counsel informed FINSA that OpenGate would agree to a 120-day due diligence period only if FINSA, upon execution of the LOI, were to deposit in escrow 7.5% of the Purchase Price, which would become non-refundable after 90 days.  That same day, FINSA informed OpenGate that this additional term was not acceptable to FINSA.  The following day, OpenGate's counsel informed FINSA that it would accept the LOI under the original terms, without the down payment provision, and provided FINSA with a final draft of the LOI to be executed by FINSA.

42.     The first version of the final draft of the LOI was addressed to "Fisher Hamilton, S. de R.L. de C.V. c/o Hamilton Scientific LLC" and the signature block read "Seller: Fisher Hamilton S. de R.L. de C.V. c/o Hamilton Scientific LLC, By: Jack Roberts, Title: President and CEO."  However, approximately 30 minutes after FINSA provided OpenGate with the first version of the LOI, OpenGate employee Daniel Abrams sent an email to FINSA stating: "Our apologies, but please use the attached version instead.  I have made a small tweak to our signature block only."  In the second and final version that FINSA was asked to execute and did execute, the LOI was also addressed to "Fisher Hamilton, S. de R.L. de C.V. c/o Hamilton Scientific LLC," but the signature block now read "Hamilton Scientific Mexico, S de R.L. de C.V., By: RoundRock Scientific International LLC, By: RoundRock 092012, its Manager, By: Jack Roberts, Title: President."  Hamilton Scientific Mexico, S. de R.L. de C.V. is an entity that had never before been disclosed to FINSA, and did not appear on any

13.

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  of the organizational charts that had been provided by OpenGate.  The parties

2  executed the LOI on August 28, 2014.

3      43.    The LOI contained the terms and conditions under which FINSA

4  would jointly execute a definitive purchase agreement and lease agreement for a

5  sale-lease back transaction with OpenGate, via Fisher Hamilton S. de R. L. de

6  C.V.  The LOI provided that FINSA would purchase the Reynosa Facility from

7  OpenGate, via Fisher Hamilton S. de R.L. de C.V., for $13,441,665.00, plus the

8  applicable value added tax ("VAT") subject to compliance with certain

9  conditions precedent within the 120-day due diligence period.  One such

10 condition precedent for execution of the Purchase Agreement provided that

11 "[e]xcept as otherwise disclosed by Seller to Buyer, the Property is free from any

12 litigation . . . of any nature whatsoever."  A separate condition precedent for

13 execution of the Purchase Agreement provided that "[a]ll representations and

14 warranties given by Seller in this LOI are and continue to be true, correct and

15 complete in all respects as of the Closing Date and Seller have delivered to Buyer

16 closing statement . . . on the Closing Date certifying the above.  Also, for the

17 avoidance of doubt all representations and warranties from Seller contained in

18 this LOI shall survive closing and shall be transcribed and included in the

19 Purchase Agreement."

20     44.    The LOI further provided that FINSA's proposal was based on the

21 assumption that "[t]he information provided to [FINSA] is true and correct in all

22 material respects; in particular, there have been no adverse changes in the state or

23 condition of the assets comprising the Property up to completion of the

24 Transaction" and "[t]he financial statements concerning Seller and Property and

25 the additional financial information to be provided by Seller in general, present a

26 fair and accurate picture of the Property."

27     45.    The LOI further provided that the Reynosa Facility would be leased

28 by FINSA back to OpenGate, via Fisher Hamilton S. de R.L. de C.V., for a

14.

*COMPLAINT*

mandatory ten-year period at a monthly rent price of $0.325 per square foot, plus VAT, and that the lease would be guaranteed by Hamilton Scientific.

46.    Despite having filed their SAC in the Thermo Fisher Action on August 7, 2014, only two weeks prior to execution of the LOI, at no time prior to entering into the LOI did OpenGate or any of its representatives disclose to FINSA the Thermo Fisher Action or the allegations underlying the action.

47.    After the parties entered into the LOI, OpenGate provided FINSA with access to certain documents to allow FINSA to perform its due diligence. The documents provided by OpenGate did not disclose the Thermo Fisher Action or the underlying allegations regarding the drug cartel activity.  Throughout the due diligence period, OpenGate repeatedly expressed a desire to close the deal as quickly as possible.  On December 3, 2014, Mr. Cano sent an email to FINSA pushing for the deal to be closed on December 5, 2014.  FINSA responded stating that FINSA wanted to close the deal on December 11, 2014, "to give us enough time to finalize everything."  Jack Roberts then responded stating, "We would really like to make this happen as soon as possible, any way to push this to close on Monday or Tuesday of next week?  Personally I would like to see us do everything we can to keep Friday [December 5, 2014] as the date if at all possible."  The following day, OpenGate requested that FINSA send "an email stating that we have agreed to a close on the 10th."  When FINSA responded that the parties had agreed to close on December 11, Jack Roberts responded by once again asking that they close on December 10.

48.    On December 11, 2014, the parties closed the deal, which involved the parties concurrently signing three transactional documents: (1) the Purchase Agreement; (2) the Lease Agreement; and (3) the Guaranty of Lease.

49.    The parties to the Purchase Agreement were FINSA and Fisher Hamilton, S. de R.L. de C.V.  The signatory for Fisher Hamilton, S. de R.L. de C.V. was Jack Roberts, who for purposes of the closing transactional documents

15.

used the name Jack Albert Larry Roberts.  The Purchase Agreement and Lease Agreement stated that Jack Albert Larry Roberts was signing the agreements "in his capacity as Legal Representative" for Fisher Hamilton S. de R.L. de C.V., and the Guaranty of Lease was signed by Jack Albert Larry Roberts as "Attorney in fact" for the guarantor Hamilton Scientific.  At the time of signing these agreements, Jack Roberts was also an employee and agent of OpenGate and the President and CEO of Hamilton Scientific.

### 1.   <u>The December 11, 2014 Purchase Agreement.</u>

50.   The Purchase Agreement provided that the purchase price for the Reynosa Facility is $13,441,665.00, plus $1,720,533.12 VAT, to be wired by FINSA to Fisher Hamilton S. de R.L. de C.V., and that the Lease Agreement would be executed concurrently with the Purchase Agreement.  The Purchase Agreement further provided that the parties "through their legal representatives, express" that the purchase price "is fair and legitimate, free of error, malice, bad faith, detriment or unjust enrichment by any of the parties."

51.   The Purchase Agreement further provided: "The SELLING PARTY represents and warrants, that: . . . To the best of its knowledge, there are no litigations or legal actions, pending or imminent, instituted by or against the SELLING PARTY according with, or which might affect the property, possession or right to dispose of the REAL ESTATE."  The Purchase Agreement also provided: "THE SELLING PARTY and THE PURCHASING PARTY represent and warrant, through their legal representatives, that: . . .  In the execution of this purchase, there has been no error, violence, bad faith, damage between them, and this instrument contains the manifestations of truth and complete understanding between the SELLING PARTY and the PURCHASING PARTY with respect to the transfer of the REAL ESTATE[.]"  The Purchase Agreement also provided that the "parties express that in this instrument there is no error, malice, bad faith or any other vice or will."

16.

*COMPLAINT*

52.   The Purchase Agreement provided that the "SELLING PARTY shall indemnify and maintain the PURCHASING PARTY free of any loss, responsibility, damage . . . including reasonable fees and expenses actually incurred by the PURCHASING PARTY" with respect to any judicial procedure regarding the Reynosa Facility, regardless of whether Fisher Hamilton S. de R.L. de C.V. "is a part of the case, which has been initiated or which is intended to be initiated at any time (even after the date of execution hereof) related with the facts that occurred prior to the date hereof and/or acts or omissions of the SELLING PARTY or which after execution of this instrument are attributable to the SELLING PARTY and which might have been contrary to the Law."

## 2.   The December 11, 2014 Lease Agreement.

53.   The Lease Agreement provided that the Lessor, FINSA, which simultaneously purchased the Reynosa Facility from OpenGate, via Fisher Hamilton S. de R.L. de C.V., agreed to lease the Reynosa Facility back to Fisher Hamilton S. de R.L. de C.V., the Lessee, for a ten-year term "mandatory and binding to the Parties," starting on December 11, 2014 and ending on December 31, 2024.  The Lease Agreement further provided that Fisher Hamilton S. de R.L. de C.V. would pay rent in the monthly amount of $120,881.15, plus the corresponding VAT, and that "the Rent shall be annually increased at a rate equal to 3.5%."

54.   The Lease Agreement further provided that during the term of the lease, FINSA shall obtain insurance policies at Fisher Hamilton S. de R.L. de C.V.'s expense to insure the Reynosa Facility, and that Fisher Hamilton S. de R.L. de C.V. shall be "responsible for the payment of any premium, deductibles and co-insurance to the insurance company[.]"  The Lease Agreement also provided that Fisher Hamilton S. de R.L. de C.V. was obligated to return the Reynosa Facility in the same condition in which it was received at the start of the lease term, and if Fisher Hamilton S. de R.L. de C.V. failed to return the leased

17.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

property in the same condition, including removing all furniture, trade fixtures, machinery and business equipment installed by lessee, then Fisher Hamilton S. de R.L. de C.V. "will pay as rent an amount equal to 200% (two hundred percent) of the current Monthly Base Rent, until Lessee returns and delivers the Leased Property to Lessor" in the required condition.

55. The Lease Agreement further provided that it constitutes a default under the Lease Agreement if Fisher Hamilton S. de R.L. de C.V. failed "to pay when due all or any portion of the Rent," failed "to comply with any term, provision or covenant of this Agreement, if the failure is not cured within 45 (forty five) calendar days," or "[i]f Lessee becomes insolvent, or if Lessee declared . . . bankruptcy or insolvent, or is in a dissolution or liquidation process, makes a transfer in fraud of creditors or makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts when due."

56. The Lease Agreement provided that in the "case of default in the payment of any amount payable hereunder, including the Rent, by Lessee, Lessee shall pay default interests with respect to any due and unpaid amount, accrued from the original payment date and until payment is fully made, at a monthly rate equal to 10% (ten percent)."

57. The Lease Agreement provided: "If a default has occurred and is existing, the non-breaching party shall have the right without notice or demand . . . to pursue any of its rights and remedies, including the right to terminate this Agreement and claim Damages and Losses[.]"  The Lease Agreement further provided that "[i]n lieu of calculating damages" FINSA "may elect to receive as liquidated damages, an amount equal to net present value of the aggregate of the Rent and other payments not paid by Lessee and which would have been payable hereunder for the original unexpired portion of the Term of this Agreement (without regard to the premature termination of the Term by reason of such event of default)."  The Lease Agreement also provided that the "repossession or re-

18.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

entering of all or any part of the Leased Property shall not relieve Lessee from its liabilities and obligations under this Agreement" and that "[e]ach right and remedy shall be cumulative and in addition to any other right and remedy now or subsequently available to Lessor at Law." The Lease Agreement further provided that "the remedies herein provided are cumulative, may be exercised jointly or severally, and are not exclusive to any other remedies."

58.     The Lease Agreement further provided that in the event of a default, FINSA is entitled to "Damages and Losses which Lessor may suffer as a direct and proximate cause of the default," and under the Lease Agreement, "Damages and Losses" includes attorneys' fees.

59.     The Lease Agreement further provided: "The Parties, through its corresponding representatives, represent that: . . .  In the execution of this Agreement there has been no error, willful misconduct, violence, duress or bad faith by any of the Parties.  Therefore, this Agreement sets out the free and voluntary consent of the Parties and does not contain any defect in the consent of the Parties."

60.     The Lease Agreement provided that the Guarantor of the lease is Hamilton Scientific LLC, located at 10250 Constellation Blvd., Suite 1750, Los Angeles, CA 90067.

**3.     The December 11, 2014 Guaranty of Lease.**

61.     The Guaranty of Lease provided that Hamilton Scientific is the majority shareholder of the Lessee, Fisher Hamilton S. de R.L. de C.V., and the Guarantor of the Lease Agreement, and by its Guaranty "intends to unconditionally guarantee the full, timely, and complete payment and performance of all of the Lessee's indebtedness and other covenants and obligations arising out of the Lease, and any and all costs of enforcing any provision under this Guaranty." The Guaranty of Lease provided that "[t]his is a Guaranty of payment and performance and not of collection. The obligations of

19.

Guarantor under this Guaranty are independent of the obligations of Lessee or any other guarantor" and "[t]his Guaranty shall not be affected or limited in any manner by whether Lessee may be liable, with respect to the Guaranteed Obligations individually, jointly without other primarily, or secondarily." The Guaranty of Lease further provided that "Guarantor's liability . . . shall in no way be impaired or affected by . . . to the extent permitted under applicable law, any other occurrence or circumstances whatsoever . . . which might otherwise constitute a legal or equitable defense of discharge of the liabilities of Guarantor or which might otherwise limit recourse against Guarantor."

62.    The Guaranty of Lease provided: "Guarantor hereby represents and warrants that . . . Guarantor has goods and net worth to enable Guarantor to promptly perform all of the Guaranteed Obligations as and when they are due" and "there is no action, suit, or proceeding pending . . . which questions the validity or enforceability of, or Guarantor's ability to perform under, this Guaranty."

63.    The Guaranty of Lease further provided: "This Guaranty shall be binding upon and shall inure to the benefit of the successors-in-interest and assigns of each party to this Guaranty." The Guaranty of Lease also provided that "[i]n the event any litigation, arbitration, mediation or other proceeding ('Proceeding') is initiated by any party against any other party to enforce this Guaranty, the prevailing party in such Proceeding shall be entitled to recover from the unsuccessful party all costs, expenses, and actual reasonable attorneys' fees relating to or arising out of such Proceeding."

**D.    After Receiving Full Payment From FINSA, OpenGate Does Not Make A Single Full Rent Payment To FINSA, Shuts Down Hamilton Scientific, And Abandons The Reynosa Facility.**

64.    On December 15, 2014, OpenGate confirmed its receipt of the funds from FINSA for the sale-lease back of the Reynosa Facility. OpenGate

*COMPLAINT*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1    confirmed that it received two wires from FINSA totaling $15,162,198.12

2    representing the purchase price and VAT for the Reynosa Facility.

3         65.    Under the terms of the Lease Agreement, OpenGate's January rent

4    payment in the amount of $120,881.15, plus the corresponding VAT, was due to

5    be paid through Fisher Hamilton S. de R.L. de C.V. with a wire transfer to

6    FINSA within the first five business days of January 2015, less than one month

7    after the sale-lease back agreement was signed on December 11, 2014.

8         66.    Fisher Hamilton S. de R.L. de C.V. failed to timely pay the rent due

9    FINSA for January 2015.  On January 28, 2015, a representative from FINSA's

10   accounting department emailed a representative from Hamilton Scientific's

11   accounting department and asked if Hamilton Scientific had "an answer

12   regarding the January 2015 rent."  Hamilton Scientific's accounting department

13   representative responded by stating that "they've told me that there is a

14   possibility that it will be paid this Friday," January 30, 2015.  On January 30,

15   2015, FINSA's accounting department representative asked by email: "Will you

16   have the proof of payment for the January 2015 rent?"  Hamilton Scientific's

17   accounting department representative responded: "I'm confirming to you that it

18   was not possible to make the payment for rent."  On February 3, 2015, FINSA's

19   accounting department representative wrote to Hamilton Scientific's accounting

20   department representative: "Once again, can you indicate to us by when you will

21   be paying the January 2015 rent."  Hamilton Scientific's accounting department

22   representative responded: "We have requested your information to our corporate,

23   but I still have gotten no answer on the payment."

24        67.    On February 9, 2015, FINSA's accounting department alerted

25   FINSA employee Hector Romeu that Fisher Hamilton S. de R.L. de C.V. had

26   also failed to pay the rent due FINSA for February 2015.  Hector Romeu

27   immediately emailed Hamilton Scientific employee Richard Cano, and asked if

28   Mr. Cano could look into it.  Richard Cano responded, stating: "We are operating

21.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

with a low cash balance which has made it difficult to pay our obligations in a timely manner.  Our executive team is fully aware of the need to pay both January and February rent and are working on a solution.  I don't have a projected payment date at this time.  I'll let you know if I hear something regarding a projected pay date."

68.   The following day, on February 10, 2015, FINSA's employee, Hector Romeu, emailed Jack Roberts and wrote: "As you may be aware the lease payments have not been made for January and February.  I was contacted by our accounting department and advised that they do not have a response from Hamilton Scientific.  It is my understanding the invoices are correct and in order. It concerns me that we have this problem at just this early stage of our business relationship.  Could you advise as to what the plan is to get this matter on the right footing and paid timely."  Shortly thereafter, Jack Roberts responded on behalf of OpenGate: "Thank you for reaching out, let me look into this issue ASAP.  We will quickly rectify the problem."  Several weeks passed, and Jack Roberts and OpenGate did not rectify the problem, as the rent remained unpaid.

69.   On March 3, 2015, at 9:22 a.m., FINSA's General Counsel emailed Richard Cano and Jack Roberts and wrote: "It has come to my attention that Hamilton has not paid a single rent under the lease agreement since closing of the transaction and now owes FINSA two months.  People [are] very nervous now and I've been asked to start reviewing this situation from a legal stand point of view due to the infructuous efforts of the asset management in getting favorable response from Hamilton.  [¶]  Are you aware of this?  If yes, please provide me with an explanation and let me know if there is anything pending on our end and/or when are you planning to pay all past due rents.  If not, please inquire internally and help me in correcting this situation as soon as possible."

70.   On March 3, 2015, at 10:55 a.m., Richard Cano responded to FINSA's General Counsel's email and informed him that he has "asked Jack to

22.

respond to your email." On that same day, at 6:56 p.m., FINSA's General
Counsel wrote to Richard Cano again and informed him: "I have received no
response from Jack. Need to resolve this ASAP. What is going on?"

71.     By the following day, March 4, 2015, at 2:37 p.m., FINSA's
General Counsel had not heard back from Richard Cano or Jack Roberts.
FINSA's General Counsel therefore emailed Mr. Cano again, and wrote:
"Richard, please talk to me. Need a response to calm people down here." At
5:16 p.m., Richard Cano finally responded to FINSA's General Counsel and
wrote: "Jack and our executive team continue working on an increase in our
credit line required for us to pay outstanding rent and continue operations. I hear
we are almost done with negotiations. Jack, please email or call Hans when you
have a minute." Jack Roberts never emailed or called FINSA's General Counsel
after being asked to do so.

72.     On March 5, 2015, OpenGate shuttered the Reynosa Facility and
ceased operations. Employees showed up for work at the Reynosa Facility and
stood outside the locked gates unable to enter, as OpenGate and Hamilton
Scientific had failed to give them any notice of their termination or that Hamilton
Scientific was being closed. The OpenGate and Hamilton Scientific employees
running the Reynosa Facility simply abandoned the Reynosa Facility without
disassembling or removing any of their manufacturing equipment.

73.     On March 5, 2015, OpenGate also ordered the termination of its
employees at Hamilton Scientific's facilities in Wisconsin, Texas and Arkansas,
and ordered the closing of these facilities. On March 12, 2015, these employees
filed a class action complaint in the United States District Court for the Western
District of Texas against Hamilton Scientific for failure to provide 60-days
advance written notice of termination, as required under the Worker Adjustment
and Retraining Notification Act of 1988, 29 U.S.C. §§2101-2109, et seq. On

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

23.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

April 1, 2015, OpenGate was added as a defendant, and on July 1, 2016, the district court approved a cash settlement.

74.   On March 11, 2015, OpenGate's counsel informed FINSA's General Counsel that OpenGate had retained a Chief Restructuring Officer from a consulting firm specializing in corporate restructurings.

75.   In March 2015, OpenGate sold Hamilton Scientific to Hamilton Laboratory Solutions, which after the purchase became incorporated as Hamilton Laboratory Solutions, LLC, on April 30, 2015.  OpenGate did not disclose to FINSA that it sold the entity that it had pledged as the Guarantor of the Lease Agreement.

76.   FINSA then served Fisher Hamilton S. de R.L de C.V., Hamilton Scientific and OpenGate with a series of notices of its breach.  First, in April 2015, FINSA served the entities with a Notice of Breach of Lease Agreement and Request for Payment.  In the Notice, FINSA requested payment for "due rent regarding the months elapsed during the period from January 1, 2015 to April 6, 2015," "insurance amount reimbursement," "default interest of due Rent and insurance reimbursement," "property tax of year 2015," and "default interests . . . for property tax."  The Notice further stated that, "in the event that Lessee does not cure its breach" within five days, then "this notice shall be considered as a notice of termination of the Lease and Lessor shall have the right to claim liquidated damages[.]"  FINSA subsequently served the entities with two more Notices requesting payment for the rent due for May and June 2015.

77.   Finally, in July 2015, FINSA served Fisher Hamilton S. de R.L. de C.V. with a Notice of Lease Agreement Early Termination, and later served copies of the same on Hamilton Scientific and OpenGate.  The Notice stated that, pursuant to the terms of the Lease Agreement, FINSA was terminating the lease due to the default events, and requested that the Lessee meet FINSA at the

*COMPLAINT*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Reynosa Facility to initiate the process of the Lessee vacating and returning the property to FINSA.

**E.    OpenGate Caused Hamilton Scientific To Close For Reasons Within OpenGate's Control That Were Not Disclosed To FINSA.**

78.    Despite representing in the Guaranty of Lease, on December 11, 2014, that Hamilton Scientific "has goods and net worth to enable [Hamilton Scientific] to promptly perform all of the Guaranteed Obligations as and when they are due" and despite OpenGate providing FINSA with projections of revenue growth through 2016, and making statements regarding its strategies for Hamilton Scientific's growth, OpenGate immediately shuttered Hamilton Scientific after entering into the sale-lease back agreement for many pre-existing reasons that were not disclosed to FINSA.

79.    In a pleading filed in the Thermo Fisher Action on March 7, 2016, one year after OpenGate closed Hamilton Scientific, OpenGate judicially admitted: "As a result of the ongoing cartel activity, the Hamilton entities have suffered damages in the form of, at least, the loss of sales, existing customers and dealers, and potential business opportunities.  Plaintiff also had difficulty obtaining funding due to cartel activity.  This has led to the eventual winding down of Hamilton Scientific in the spring of 2015."  None of these facts were disclosed by OpenGate or Hamilton Scientific to FINSA at any time, and in fact, OpenGate made misrepresentations to convey the opposite of these facts.

80.    In addition to OpenGate's admissions that the cartel activity at the Reynosa Facility affected Hamilton Scientific's business, on information and belief, Hamilton Scientific also struggled for other unrelated reasons that also were not disclosed to FINSA.  For instance, OpenGate failed to capitalize Hamilton Scientific adequately, which doomed it to failure.  On information and belief, during its brief ownership of Hamilton Scientific, OpenGate stripped millions of dollars from the cash-starved business.  Furthermore, on information

25.

and belief, because potential lenders recognized that if they put additional money into Hamilton Scientific, OpenGate would just funnel the money up the corporate chain into its partners' pockets, Hamilton Scientific could not raise the additional money it needed.

81.     On information and belief, by the time OpenGate entered into the sale-lease back agreement with FINSA, unbeknown to FINSA, Hamilton Scientific had become insolvent and unable to pay its creditors.  Then, after receiving more than $15 million from FINSA with the sale-lease back agreement, on information and belief, OpenGate denied Hamilton Scientific the use of this lifeline of new cash by immediately siphoning away these proceeds to, among other things, (i) pay a $1.5 million loan for an OpenGate affiliate; (ii) prepay another $1 million loan from another OpenGate affiliate, which was not due until 2017; (iii) pay OpenGate a discretionary $1.1 million in management fees, and (iv) pay OpenGate's attorneys' fees in the Thermo Fisher action.  On information and belief, after OpenGate made its self-dealing payments, Hamilton Scientific was again short on cash and unable to pay the creditors it needed to run the business, including FINSA, while OpenGate had turned a handsome profit on its investment in Hamilton Scientific.  On information and belief, in a 2015 presentation to potential investors, OpenGate touted that it realized $6.728 million on its $2.548 million investment in Hamilton Scientific, a realization multiple of 2.6x.

## V.     <u>ALTER EGO, AGENCY AND SUCCESSOR LIABILITY ALLEGATIONS</u>

82.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 81 of this Complaint as though set forth fully herein.

83.     In the Thermo Fisher Action, where OpenGate Capital, LLC was the plaintiff in a lawsuit alleging fraud by Thermo Fisher in the sale of the Reynosa

26.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Facility to OpenGate, OpenGate Capital, LLC repeatedly confirmed that Open Publishing, LLC is a mere instrumentality of OpenGate Capital, LLC and as between the two entities there is a unity of interest and ownership such that the separate personalities of the entities do not exist.  In the Thermo Fisher Action, OpenGate Capital, LLC alleged that all its actions are the actions of Open Publishing, LLC, and vice versa, and the entities confirmed that all claims of Open Publishing, LLC belonged to OpenGate Capital, LLC, and vice versa, and collectively referred to these two entities as "OpenGate" throughout the litigation, including in all pleadings filed.  Also, OpenGate Capital, LLC and Open Publishing, LLC commingle assets, and OpenGate Capital, LLC holds itself out as responsible for the debts and liabilities of Open Publishing, LLC. Open Publishing, LLC is not adequately capitalized by OpenGate Capital, LLC. OpenGate Capital, LLC and Open Publishing, LLC have the same ownership, employees, and offices.  Open Publishing, LLC is a shell or conduit of OpenGate Capital, LLC that is used as a holding company for another subsidiary that OpenGate Capital, LLC admits is not independent of OpenGate Capital, LLC., namely RoundRock 0920120, LLC.

84.     Similarly, in the Thermo Fisher Action, the OpenGate Entities and the RoundRock Entities repeatedly confirmed that the RoundRock Entities are mere instrumentalities of the OpenGate Entities such that there is a unity of interest and ownership such that the separate personalities of the entities do not exist.  The OpenGate Entities and the RoundRock Entities both made the judicial admission in the Thermo Fisher Action that "[i]t ignores reality to divorce RoundRock from OpenGate . . . and pretend that RoundRock is independent" from the OpenGate Entities.  The OpenGate Entities and the RoundRock Entities further admitted that the OpenGate Entities staffed and funded the RoundRock Entities.  In the Thermo Fisher Action, the OpenGate Entities alleged that its actions are the actions of the RoundRock Entities, and vice versa, and the

27.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

OpenGate Entities confirmed that the claims of the RoundRock Entities belonged to the OpenGate Entities, and vice versa, and collectively referred to the OpenGate Entities and the RoundRock Entities as "Plaintiffs" throughout the litigation.  Also, the OpenGate Entities and the RoundRock Entities commingle assets, and the OpenGate Entities hold themselves out as responsible for the debts and liabilities of the RoundRock Entities.  The RoundRock Entities are not adequately capitalized by the OpenGate Entities.  The OpenGate Entities and the RoundRock Entities have the same ownership, employees, and offices.  The RoundRock Entities are a shell or conduit of the OpenGate Entities and are used as holding companies or acquisition vehicles for subsidiaries that are not independent of the OpenGate Entities, namely Hamilton Scientific, LLC and Fisher Hamilton S. de R.L. de C.V.

85.     Fisher Hamilton S. de R.L. de C.V. is a mere instrumentality of the OpenGate and RoundRock Entities, and despite those entities' representations to FINSA that Fisher Hamilton S. de R.L. de C.V. was the entity in which ownership of the Reynosa Facility resided, OpenGate and RoundRock Entities did not name Fisher Hamilton S. de R.L. de C.V. as a plaintiff in the Thermo Fisher Action, did not allege that it was an owner of the Reynosa Facility, and insisted that the proper plaintiffs with standing in that action were the OpenGate and RoundRock Entities.  The OpenGate and RoundRock Entities commingle assets with Fisher Hamilton S. de R.L. de C.V., and the OpenGate and RoundRock Entities hold themselves out as responsible for the debts and liabilities of the RoundRock Entities.  When Fisher Hamilton S. de R.L. de C.V. failed to make the rent payments it was required to make under the Lease Agreement, Hamilton Scientific did not make the payments it was required to make as the guarantor, and Hamilton Scientific confirmed that the rent payments would only be made if OpenGate could supply it with the funds.  Fisher Hamilton S. de R.L. de C.V. was not adequately capitalized by the OpenGate and

28.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

RoundRock Entities.  Fisher Hamilton S. de R.L. de C.V. has the same ownership and employees as the OpenGate and RoundRock Entities.  Fisher Hamilton S. de R.L. de C.V. is a shell or conduit of the OpenGate and RoundRock Entities.

86.     Prior to it being closed and sold by OpenGate, Hamilton Scientific was a mere instrumentality of the OpenGate and RoundRock Entities.  The OpenGate and RoundRock Entities commingled assets with Hamilton Scientific, and the OpenGate and RoundRock Entities held themselves out as responsible for the debts and liabilities of the RoundRock Entities.  When Fisher Hamilton S. de R.L. de C.V. failed to make the rent payments it was required to make under the Lease Agreement, Hamilton Scientific did not make the payments it was required to make as the guarantor, and confirmed that the rent payments would only be made if OpenGate could supply the funds.  Hamilton Scientific was not adequately capitalized by the OpenGate and RoundRock Entities.  Hamilton Scientific has the same ownership and employees as the OpenGate and RoundRock Entities.  Fisher Hamilton S. de R.L. de C.V. is a shell or conduit of the OpenGate and RoundRock Entities.  All decisions relating to the firings and plant closures in the United States and at the Reynosa Facility were made solely by OpenGate, and not by Hamilton Scientific.  At all times, OpenGate maintained complete control over Hamilton Scientific.  Jack Roberts was Hamilton Scientific's CEO and President in name only, and acted at all times in the interest of OpenGate, and not Hamilton Scientific.  In addition, RoundRock Scientific International LLC's subsidiaries, Hamilton Scientific and Fisher Hamilton S. de R.L. de C.V., are each other's alter ego, as these two sister companies operate as a single enterprise.  OpenGate employee Jack Roberts signed the Lease Agreement and Guaranty of Lease on behalf of both Hamilton Scientific and Fisher Hamilton S. de R.L. de C.V., as the attorney for both entities.

29.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

87. Failure to disregard the separate identities of the OpenGate Entities, the RoundRock Entities, Fisher Hamilton S. de R.L. de C.V. and Hamilton Scientific would result in fraud or injustice. OpenGate fraudulently made Fisher Hamilton S. de R.L. de C.V. the Lessee, with knowledge that it was not adequately capitalized to pay rent that was due only three weeks after the Lease Agreement was signed, let alone for the entire ten-year duration of the lease, and made Hamilton Scientific the Lessee's guarantor, even though OpenGate knew that Hamilton Scientific also was not adequately capitalized and that it intended to close and sell Hamilton Scientific almost immediately.

88. In addition to the alter ego relationships among and between the OpenGate Entities, the RoundRock Entities, Fisher Hamilton S. de R.L. de C.V. and Hamilton Scientific—Open Publishing, LLC, the RoundRock Entities, Fisher Hamilton S. de R.L. de C.V. and Hamilton Scientific are also the agents of OpenGate Capital, LLC, and each subsidiary is an agent of each parent. The degree of control exerted over each subsidiary by each parent is sufficient to deem each subsidiary an agent of each parent. Each parent exercises such a degree of control over each subsidiary that each subsidiary can legitimately be described as only a means through which each parent acts, or nothing more than an incorporated department of the parent. Each parent's degree of control over each subsidiary is over and above that to be expected as incident of each parent's ownership of each subsidiary.

89. Hamilton Laboratory Solutions is liable for the claims against Hamilton Scientific because the sale of Hamilton Scientific to Hamilton Laboratory Solutions was a de facto merger, or Hamilton Laboratory Solutions was a mere continuation of Hamilton Scientific, or the sale was fraudulently entered into in order for Hamilton Scientific to escape liability. Hamilton Laboratory Solutions did not give Hamilton Scientific consideration that was adequate to satisfy Hamilton Scientific's creditors. OpenGate did not disclose to

30.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

FINSA that it sold Hamilton Scientific to Hamilton Laboratory Solutions, which was incorporated after it purchased Hamilton Scientific.  Hamilton Laboratory Solutions continued the same enterprise as Hamilton Scientific after the sale, manufacturing the same product, with identical employees and management, and using the same intellectual property, website, and social media accounts. Hamilton Laboratory Solutions has made numerous public statements confirming the de facto merger with or the continuation of Hamilton Scientific.  In one press release, Hamilton Laboratory Solutions referred to its name change as a "rebranding process" and in other press releases and on its website, Hamilton Laboratory Solutions stated that it was founded in 1880, and boasts about "the 135-year old history of Hamilton Laboratory Solutions."  Separately, with regard to Hamilton Scientific's guarantee of the Lease Agreement, the Guaranty of Lease provides that: "This Guaranty shall be binding upon and shall inure to the benefit of the successors-in-interest and assigns of each party to this Guaranty."

# VI.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Fraudulent Representations – Against All Defendants)

90.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 89 of this Complaint as though set forth fully herein.

91.    Defendants made the following false representations to FINSA:

a.    On July 7, 2014, OpenGate employee Virginia Thornton provided FINSA with false financial forecasts for Hamilton Scientific, projecting significant growth for Hamilton Scientific's and the Reynosa Facility's revenues through 2016.

b.    On July 29, 2014, OpenGate and Hamilton Scientific employee Jack Roberts provided FINSA with false details regarding Hamilton Scientific's and the Reynosa Facility's growth strategies going forward.

31.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

c.     On August 28, 2014, OpenGate and Hamilton Scientific employee Jack Roberts signed the LOI on behalf of RoundRock Scientific International, LLC and RoundRock 092012 LLC, which falsely represented that:

i.     "[T]he property is free from any litigation[.]"

ii.     "The information provided to [FINSA] is true and correct in all material respects; in particular, there have been no adverse changes in the state or condition of the assets comprising the Property up to completion of the Transaction."

iii.     "The financial statements concerning Seller and the Property and the additional information to be provided by Seller in general, present a fair and accurate picture of the Property."

iv.     "This proposal reflects our best estimate for the value of the Property given the information that we have available."

d.     On December 11, 2014, OpenGate and Hamilton Scientific employee Jack Roberts signed the Purchase Agreement on behalf of Fisher Hamilton, S. de R.L. de C.V., which falsely represented that:

i.     The agreed upon purchase price "is fair and legitimate, free of error, malice, bad faith, detriment or unjust enrichment by any of the parties."

ii.     "The SELLING PARTY represents and warrants, that: . . . To the best of its knowledge, there are no litigations or legal actions, pending or imminent, instituted by or against the SELLING PARTY according with, or which might affect the property, possession or right to dispose of the REAL ESTATE."

iii.     "THE SELLING PARTY and THE PURCHASING PARTY represent and warrant, through their legal representatives, that: . . . In the execution of this purchase, there has been no error, violence, bad faith, damage between them, and this instrument contains the

32.

manifestations of truth and complete understanding between the SELLING PARTY and the PURCHASING PARTY with respect to the transfer of the REAL ESTATE[.]"

iv.     The "parties express that in this instrument there is no error, malice, bad faith or any other vice or will."

e.     On December 11, 2014, OpenGate and Hamilton Scientific employee Jack Roberts signed the Lease Agreement on behalf of Fisher Hamilton, S. de R.L. de C.V., which falsely represented that: "The Parties, through its corresponding representatives, represent that: . . .  In the execution of this Agreement there has been no error, willful misconduct, violence, duress or bad faith by any of the Parties.  Therefore, this Agreement sets out the free and voluntary consent of the Parties and does not contain any defect in the consent of the Parties."

f.     On December 11, 2014, OpenGate and Hamilton Scientific employee Jack Roberts signed the Guaranty of Lease on behalf of Hamilton Scientific, which falsely represented that:

i.     "Guarantor has goods and net worth to enable Guarantor to promptly perform all of the Guaranteed Obligations as and when they are due[.]"

ii.     "[T]here is no action, suit, or proceeding pending . . . which questions the validity or enforceability of, or Guarantor's ability to perform under, this Guaranty."

92.     Defendants knew that each of these representations was false, and the representations were made with the intent to induce reliance by FINSA so that FINSA would agree to the terms of the Purchase Agreement, Lease Agreement and Guaranty of Lease.

93.     FINSA actually and justifiably relied on Defendants' representations, all of which were material to the underlying agreements.  FINSA

33.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

would not have entered into the agreements with Defendants had FINSA known that the representations were false.

94.     As a direct and proximate cause of Defendants' false representations, FINSA has been damaged in an amount to be proven at trial, but in excess of the jurisdictional limits.

95.     Defendants acted with oppression, fraud, and/or malice, and FINSA is therefore entitled to punitive and/or exemplary damages.

WHEREFORE, Plaintiffs pray for judgment against all Defendants, and each of them, as more fully set forth below.

## SECOND CAUSE OF ACTION

### (Fraudulent Concealment – Against All Defendants)

96.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 95 of this Complaint as though set forth fully herein.

97.     Defendants failed to disclose the following facts to FINSA:

a.     The fact of the existence of the Thermo Fisher Action and the facts underlying OpenGate's claims in that action.

b.     The true facts regarding the financial condition and projections for the lessee, Fisher Hamilton, S. de R.L. de C.V., the guarantor, Hamilton Scientific, and the Reynosa Facility.

c.     The fact that OpenGate intended to close and sell Hamilton Scientific, when it designated Hamilton Scientific as a guarantor for the ten-year lease.

98.     Defendants had a duty to disclose these facts to FINSA because: (i) Defendants, as the seller, had a common law duty to disclose information materially affecting the value or desirability of the property being sold; (ii) Defendants made partial disclosures that were incomplete or misleading;

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1   (iii) Defendants had a fiduciary relationship with FINSA;

2   (iv) some of the information was exclusively within their knowledge.

3       99.    Defendants intentionally concealed this information with the intent

4   to defraud FINSA so that FINSA would agree to the terms of the Purchase

5   Agreement, the Lease Agreement and Guaranty of Lease.

6       100.   Had FINSA been aware of the facts that were concealed, all of

7   which were material to the underlying agreements, FINSA would not have

8   entered into the agreements with Defendants.

9       101.   As a direct and proximate cause of Defendants' concealment of

10  these facts, FINSA has been damaged in an amount to be proven at trial, but in

11  excess of the jurisdictional limits.

12      102.   Defendants acted with oppression, fraud, and/or malice, and FINSA

13  is therefore entitled to punitive and/or exemplary damages.

14      WHEREFORE, Plaintiffs pray for judgment against all Defendants, and

15  each of them, as more fully set forth below.

16  ### THIRD CAUSE OF ACTION

17  **(Promissory Fraud – Against All Defendants)**

18      103.   Plaintiffs re-allege and incorporate herein by this reference each and

19  every allegation set forth in paragraphs 1 through 102 of this Complaint as

20  though set forth fully herein.

21      104.   Defendants promised to perform in accordance with the December

22  11, 2014 Lease Agreement and Guaranty of Lease.

23      105.   Defendants did not intend to perform as promised under the Lease

24  Agreement and the Guaranty of Lease, and in fact, starting in January 2015, less

25  than one month after entering into the ten-year Lease Agreement, Defendants did

26  not even make the first full rent payment, and immediately closed and sold

27  Hamilton Scientific.  Defendants made misrepresentations and actively

28  concealed facts for the purposes of inducing FINSA's reliance on the promises of

35.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

performance so that FINSA would agree to the terms of the Purchase Agreement, Lease Agreement and Guaranty of Lease.

106.   FINSA relied upon Defendants promises and agreed to enter into the Lease Agreement and Guaranty of Lease.  FINSA would not have entered into the agreements if Defendants had not promised to perform as required.

107.   As a direct and proximate cause of Defendants' false promises, FINSA has been damaged in an amount to be proven at trial, but in excess of the jurisdictional limits.

108.   Defendants acted with oppression, fraud, and/or malice, and FINSA is therefore entitled to punitive and/or exemplary damages.

WHEREFORE, Plaintiffs pray for judgment against all Defendants, and each of them, as more fully set forth below.

## FOURTH CAUSE OF ACTION

### (Constructive Fraud – Against All Defendants)

109.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 108 of this Complaint as though set forth fully herein.

110.   Defendants, who had fiduciary duties to FINSA to act with the utmost good faith in the sale-lease back of the Reynosa Facility, made misrepresentations of the following past or existing material facts without reasonable grounds for believing them to be true:

a.   On July 7, 2014, OpenGate employee Virginia Thornton provided FINSA with false financial forecasts for Hamilton Scientific, projecting significant growth for Hamilton Scientific's and the Reynosa Facility's revenues through 2016.

b.   On July 29, 2014, OpenGate and Hamilton Scientific employee Jack Roberts provided FINSA with false details regarding Hamilton Scientific's and the Reynosa Facility's growth strategies going forward.

36.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

c. On August 28, 2014, OpenGate and Hamilton Scientific employee Jack Roberts signed the LOI on behalf of RoundRock Scientific International, LLC and RoundRock 092012 LLC, which falsely represented that:

  i. "[T]he property is free from any litigation[.]"

  ii. "The information provided to [FINSA] is true and correct in all material respects; in particular, there have been no adverse changes in the state or condition of the assets comprising the Property up to completion of the Transaction."

  iii. "The financial statements concerning Seller and the Property and the additional information to be provided by Seller in general, present a fair and accurate picture of the Property."

  iv. "This proposal reflects our best estimate for the value of the Property given the information that we have available."

d. On December 11, 2014, OpenGate and Hamilton Scientific employee Jack Roberts signed the Purchase Agreement on behalf of Fisher Hamilton, S. de R.L. de C.V., which falsely represented that:

  i. The agreed upon purchase price "is fair and legitimate, free of error, malice, bad faith, detriment or unjust enrichment by any of the parties."

  ii. "The SELLING PARTY represents and warrants, that: . . . To the best of its knowledge, there are no litigations or legal actions, pending or imminent, instituted by or against the SELLING PARTY according with, or which might affect the property, possession or right to dispose of the REAL ESTATE."

  iii. "THE SELLING PARTY and THE PURCHASING PARTY represent and warrant, through their legal representatives, that: . . . In the execution of this purchase, there has been not error, violence, bad faith, damage between them, and this instrument contains the

37.

manifestations of truth and complete understanding between the SELLING
PARTY and the PURCHASING PARTY with respect to the transfer of the
REAL ESTATE[.]"

        iv.     The "parties express that in this instrument there is no
error, malice, bad faith or any other vice or will."

        e.     On December 11, 2014, OpenGate and Hamilton Scientific
employee Jack Roberts signed the Lease Agreement on behalf of Fisher
Hamilton, S. de R.L. de C.V., which falsely represented that: "The Parties,
through its corresponding representatives, represent that: . . .  In the execution of
this Agreement there has been no error, willful misconduct, violence, duress or
bad faith by any of the Parties.  Therefore, this Agreement sets out the free and
voluntary consent of the Parties and does not contain any defect in the consent of
the Parties."

        f.     On December 11, 2014, OpenGate and Hamilton Scientific
employee Jack Roberts signed the Guaranty of Lease on behalf of Hamilton
Scientific, which falsely represented that:

        i.     "Guarantor has goods and net worth to enable
Guarantor to promptly perform all of the Guaranteed Obligations as and
when they are due[.]"

        ii.     "[T]here is no action, suit, or proceeding pending . . .
which questions the validity or enforceability of, or Guarantor's ability to
perform under, this Guaranty."

111.   Defendants made these misrepresentations with the intent to induce
FINSA's reliance on the misrepresented facts so that FINSA would agree to the
terms of the Purchase Agreement, Lease Agreement and Guaranty of Lease.

112.   FINSA was ignorant of the true facts and justifiably relied on the
misrepresentations.  FINSA would not have entered into the agreements with
Defendants had FINSA known that the representations were false.

38.

*COMPLAINT*

113.   As a direct and proximate cause of Defendants' false representations, FINSA has been damaged in an amount to be proven at trial, but in excess of the jurisdictional limits.

114.   Defendants acted with oppression, fraud, and/or malice, and FINSA is therefore entitled to punitive and/or exemplary damages.

WHEREFORE, Plaintiffs pray for judgment against all Defendants, and each of them, as more fully set forth below.

## FIFTH CAUSE OF ACTION

### (Breach of Contract (Lease Agreement) – Against All Defendants)

115.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 114 of this Complaint as though set forth fully herein.

116.   On December 11, 2014, FINSA entered into the Lease Agreement with Defendants' alter ego, Fisher Hamilton S. de R.L. de C.V.  FINSA performed as required under the Lease Agreement by granting Defendants the temporary use and possession of the Reynosa Facility and complying with all other terms and conditions of the Lease Agreement.

117.   Defendants breached the Lease Agreement by failing to make the payments due under the Lease Agreement, including the due rent, insurance amount reimbursements, default interest of due rent and insurance reimbursement, property tax and default interest for property tax, and any other amounts due under the Lease Agreement.

118.   As a direct and proximate result of Defendants' breach of the Lease Agreement, FINSA has been damaged and is entitled to damages in an amount to be determined at trial, but in excess of the jurisdictional limits.

WHEREFORE, Plaintiffs pray for judgment against all Defendants, and each of them, as more fully set forth below.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

*COMPLAINT*

## SIXTH CAUSE OF ACTION

### (Breach of Contract (Guaranty of Lease) – Against All Defendants)

119.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 118 of this Complaint as though set forth fully herein.

120.   On December 11, 2014, FINSA entered into the Guaranty of Lease with Defendants' alter ego and predecessor, Hamilton Scientific, LLC.  FINSA performed as required under the Guaranty of Lease by concurrently entering into the Lease Agreement, which, as set forth in the Guaranty of Lease, "Lessor would not have entered into . . . without having received the Guaranty executed by the Guarantor as an inducement to Lessor."  FINSA performed as required under the Lease Agreement by granting Defendants the temporary use and possession of the Reynosa Facility and complying with all other terms and conditions of the Lease Agreement.

121.   Defendants breached the Guaranty of Lease by failing to make any of the payments due under the Guaranty of Lease

122.   As a direct and proximate result of Defendants' breach of the Guaranty of Lease, FINSA has been damaged and is entitled to damages in an amount to be determined at trial, but in excess of the jurisdictional limits.

WHEREFORE, Plaintiffs pray for judgment against all Defendants, and each of them, as more fully set forth below.

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants as follows:

### FIRST CAUSE OF ACTION

### (Fraudulent Representations – Against All Defendants)

1.    For compensatory damages and other special, general and consequential damages according to proof;

2.    For an award of punitive and exemplary damages;

40.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

3. For an award of interest, including prejudgment interest, according to law;

4. For an award of costs of suit, including attorneys' fees;

5. For such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

### (Fraudulent Concealment – Against All Defendants)

1. For compensatory damages and other special, general and consequential damages according to proof;

2. For an award of punitive and exemplary damages;

3. For an award of interest, including prejudgment interest, according to law;

4. For an award of costs of suit, including attorneys' fees;

5. For such other and further relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION

### (Promissory Fraud – Against All Defendants)

1. For compensatory damages and other special, general and consequential damages according to proof;

2. For an award of punitive and exemplary damages;

3. For an award of interest, including prejudgment interest, according to law;

4. For an award of costs of suit, including attorneys' fees;

5. For such other and further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION

### (Constructive Fraud – Against All Defendants)

1. For compensatory damages and other special, general and consequential damages according to proof;

2. For an award of punitive and exemplary damages;

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

41.

1   3.   For an award of interest, including prejudgment interest, according

2   to law;

3   4.   For an award of costs of suit, including attorneys' fees;

4   5.   For such other and further relief as this Court deems just and proper.

5   ## FIFTH CAUSE OF ACTION

6   **(Breach of Contract (Lease Agreement) – Against All Defendants)**

7   1.   For compensatory damages and other special, general and

8   consequential damages according to proof;

9   2.   For an award of interest, including prejudgment interest, according

10  to law;

11  3.   For an award of costs of suit, including attorneys' fees;

12  4.   For such other and further relief as this Court deems just and proper.

13  ## SIXTH CAUSE OF ACTION

14  **(Breach of Contract (Guaranty of Lease) – Against All Defendants)**

15  1.   For compensatory damages and other special, general and

16  consequential damages according to proof;

17  2.   For an award of interest, including prejudgment interest, according

18  to law;

19  3.   For an award of costs of suit, including attorneys' fees;

20  4.   For such other and further relief as this Court deems just and proper.

21  ## VIII.   DEMAND FOR JURY TRIAL

22  Plaintiffs hereby demand a jury trial.

23  Dated:  June 12, 2017          SPERTUS, LANDES & UMHOFER, LLP

24  By: _____

25  James W. Spertus

26  Ezra D. Landes
    Attorneys for Plaintiffs Finsa Portafolios,

27  S.A. de C.V. and FINSA CKD M
    Fideicomiso CIB/2017

28

*COMPLAINT*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711